# EXHIBIT A

PUBLIC VERSION

UNITED STATES INTERNATIONAL TRADE COMMISSION

Washington, D.C.

| | |
|---|---|
| **In the Matter of** | |
| **CERTAIN SOLID STATE STORAGE DRIVES, STACKED ELECTRONICS COMPONENTS, AND PRODUCTS CONTAINING SAME** | Inv. No. 337-TA-1097 |

**INITIAL DETERMINATION FINDING SATISFACTION OF ECONOMIC PRONG WITH RESPECT TO THE '243 PATENT, '416 PATENT, AND '103 PATENT AND TERMINATING THE INVESTIGATION WITH RESPECT TO THE '190 PATENT**

(May 11, 2018)

Pursuant to the Notice of Investigation (Jan. 19, 2018), this is the Administrative Law Judge's early initial determination with respect to the economic prong of the domestic industry requirement. For the reasons discussed below, it is my initial determination that the economic prong is satisfied with respect to articles that are alleged to practice claims of the '243 patent, '416 patent, and '103 patent, but the economic prong is not satisfied with respect to articles that are alleged to practice the '190 patent.

## I. BACKGROUND

### A. Procedural History

On December 21, 2017, Complainant BiTMICRO, LLC ("BiTMICRO") filed a complaint under 19 U.S.C. § 1337 alleging unlawful importation into the United States, the sale for importation, or sale within the United States after importation of certain solid-state drives, stacked electronics components, and products containing the same by infringement of U.S. Patent Nos. 7,826,243 ("the '243 patent"), 8,093,103 ("the '103 patent"), 6,529,416 ("the '416 patent"), and 9,135,190 ("the '190 patent") (the "Asserted Patents"). *See* Complaint Under

1

**PUBLIC VERSION**

Section 337 of the Tariff Act of 1930, as amended (Dec. 21, 2017) ("Complaint"). On January 9, 2017, BiTMICRO filed an amended complaint. *See* First Amended Complaint Under Section 337 of the Tariff Act of 1930, as amended (Jan. 9, 2018) ("Amended Complaint"). The investigation was instituted upon publication of the Notice of Investigation on Friday, January 26, 2018. 83 Fed. Reg. 3771-72 (2018). The Commission further ordered an early evidentiary hearing and decision as to whether Complainant has satisfied the economic prong of the domestic industry requirement. *Id.* at 3771.[1]

BiTMICRO's alleged domestic industry relates to investments made by its licensee BiTMICRO Networks, Inc. ("BNI") with respect to two products, the Altima I and the ACE II. Complainant's Post-Hearing Brief at 2-5 (Apr. 3, 2018). With respect to BNI's investments related to the Altima I, BiTMICRO claims a domestic industry in the '416, '243, and '103 patents under subsections (A) and (B) of section 337(a)(3). *Id.* at 14-53. With respect to BNI's investments related to the ACE II, BiTMICRO claims a domestic industry in the '190 patent under subsections (A) and (B) of section 337(a)(3). *Id.* at 56-58. In the alternative, BiTMICRO alleges satisfaction of the economic prong requirement under section 337(a)(3)(C) for engineering activities relating to the ACE II and Altima I. *Id.* at 53-56, 58-59.[2,3]

---

[1] Respondents assert that "the Commission properly flagged Complainant's alleged domestic industry allegations based on the activities of its licensee as suspect and put the issue into the Commission's 100-day program." Respondents' Post-Hearing Brief (Apr. 3, 2018) at 1. The reason why this matter was assigned to the 100-day program, however, is not in the record. I assume it was included because the Commission determined that the domestic industry/economic prong issue could be decided within 100 days. In particular, I do not view the assignment as indicative of any views of the Commission concerning the merits of the issue before me.

[2] BiTMICRO's contentions with respect to subsection (C) were filed in response to Order No. 5 (Mar. 1, 2018), which required the parties to brief the issue of whether certain investments in engineering and/or research and development qualify as domestic industry expenditures under subsection (C) of section 337(a)(3). 19 U.S.C. § 1337(a)(3)(C). Order No. 5 was issued to ensure a complete record for review, consistent with the Commission's order in *Certain Robotic Vacuum Cleaning Devices and Components Thereof Such as Spare Parts*, Inv. No. 337-TA-

**PUBLIC VERSION**

An evidentiary hearing was held on March 22, 2018.  Following opening statements, BiTMICRO's first witness was Stephen Uriarte, the President and General Counsel for BNI.  Tr. at 67-137; CX-0864C (Uriarte WS).  Next, BiTMICRO called Larry Rosolowski, the acting Chief Financial Officer of BNI.  Tr. at 138-54; CX-0863C (Rosolowski WS).  BiTMICRO then called Dr. Coleman Bazelon, who was qualified as an expert in economics.  Tr. at 155-95; CX-0865C (Bazelon WS).  Respondents' first witness was Ms. Julia Rowe, who was qualified as an expert in financial analysis and accounting.  Tr. at 196-212; RX-0132C (Rowe WS). Respondents next called Jake Baker, who was qualified as an expert in the field of memory design, operation, stacking and packaging.  Tr. at 213-35; RX-0133C (Baker WS).  Respondents' last witness was Thomas Vander Veen, who was qualified as an expert in economics.  Tr. at 235-38; RX-0131C (Vander Veen WS).

### B.  The Parties

Complainant BiTMICRO is a Delaware corporation with an office in Reston, Virginia. Amended Complaint at ¶ 6.  BiTMICRO's licensee, non-party BNI, is a California corporation with its principal place of business in Fremont, California.  *Id.* at ¶ 7.  BNI sells solid state drives to military, industrial, and enterprise markets for use in harsh environments.  *Id.*  BiTMICRO is

---

1057, Comm'n Notice (Mar. 15, 2018) at 2 (requesting briefing on "whether Complainant is permitted to rely upon its research and development investments under section 337(a)(3)(A) and (B) or whether such investments are only applicable to establishing a domestic industry under section 337(a)(3)(C)").

[3] Respondents have alleged previously that BiTMICRO should not be permitted to rely on section 337(a)(3)(C), based on BiTMICRO's discovery responses waiving reliance on subsection (C).  It is not my practice to permit a party to "waive" compliance with potentially applicable statutory requirements.  *See* 19 C.F.R. 210.27(b) (3) (limiting discovery as to matters *determined by the administrative law judge* to have been waived) (emphasis added).  Respondents did not seek extension of the applicable deadlines for the purpose of responding to BiTMICRO's allegations under subsection (C).

PUBLIC VERSION

co-owned by BNI.  *Id.* at ¶ 6, 7.  BNI was the previous owner of the Asserted Patents, and

BiTMICRO became the owner of the Asserted Patents through a patent purchase agreement and

a recordable assignment of patent rights dated June 29 and 30, 2017.  *Id.* at ¶¶ 6, 9; CX-0001C

(Patent Purchase Agreement).  The patent purchase agreement indicates that BiTMICRO is a

█ ▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁ ▁▁▁▁▁▁ ▏.  CX-0001C at 8 (▏ ▁▁▁▁ ▏

▏▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁▁).  BiTMICRO purchased the patents from

BNI in exchange for █████████████████  ████ ▁▁▁▁▁▁▁▁ ▏

▏█████████████████████▏.  *Id.* at 18, 19.

The respondents include leading memory and consumer electronics manufacturers.

Respondents' Post-Hearing Brief at 7.  Many of the accused products are used in downstream

consumer devices such as laptops, desktops, tablets, mobile phones, and wearable devices.  *Id.*

BiTMICRO does not contend that any respondent's product competes with BNI for sales of

BNI's alleged domestic industry products, which are "ruggedized" solid state drives.  *Id.*

Respondent Samsung Electronics Co., Ltd. is a corporation organized under the laws of

the Republic of Korea, with its principal place of business in Suwon, South Korea.  Amended

Complaint at ¶ 11.  Respondent Samsung Semiconductor, Inc. is a California corporation with its

principal place of business in San Jose, California.  *Id.* at ¶ 12.  Respondent Samsung Electronics

America, Inc. is a New York corporation with its principal place of in Ridgefield Park, New

Jersey.  *Id.* at ¶ 13.

Respondent SK Hynix Inc. is a corporation organized under the laws of the Republic of

Korea, with its principal place of business in Icheon, South Korea.  *Id.* at ¶15.  Respondent SK

Hynix America Inc. is a California corporation with its principal place of business in San Jose,

California.  *Id.* at ¶ 16.

**PUBLIC VERSION**

Respondent Dell Inc. is a privately held corporation organized under the laws of the state of Delaware, with its principal place of business in Round Rock, Texas. *Id.* at ¶18. Respondent Dell Technologies Inc. is a Delaware corporation with its principal place of business also in Round Rock, Texas. *Id.* at ¶ 19.

Respondent Lenovo Group Ltd. is a Chinese company with its corporate office in Beijing, China. *Id.* at ¶ 22. Respondent Lenovo (United States) Inc. is a Delaware corporation having its principal place of business in Morrisville, North Carolina. *Id.* at ¶ 23.

Respondent HP Inc. is a Delaware corporation with its principal place of business in Palo Alto, California. *Id.* at ¶ 26. Respondent Hewlett Packard Enterprise Co. is also a Delaware corporation with its principal place of business in Palo Alto, California. *Id.* at ¶ 27.

Respondent ASUSTeK Computer Inc. is a corporation organized under the laws of the Republic of China (Taiwan) with its principal place of business in Taipei, Taiwan. *Id.* at ¶33. Respondent ASUS Computer International is a California corporation with its headquarters in Fremont, California. *Id.* at ¶ 34.

Respondent Acer Inc. is a Taiwanese corporation with its principal place of in New Taipei City, Taiwan. *Id.* at ¶ 37. Respondent Acer America Corp. is a California corporation with its principal place of in San Jose, California. *Id.* at ¶ 38.

Respondent VAIO Corporation is a Japanese corporation with its principal place of business in Azumino, Japan. *Id.* at ¶ 41.

Respondent Transcosmos America Inc. is a California corporation with its principal place of business in Gardena, California. *Id.* at ¶ 44.

**PUBLIC VERSION**

### C. The Patents at Issue

The '190 patent is directed to a multi-profile memory controller for computer devices. *Id.* at ¶ 57. BiTMICRO asserts that BNI's ACE II product practices the '190 patent.

The '416 patent is directed to techniques for performing parallel erase operations in memory. *Id.* at ¶ 52. BiTMICRO asserts that BNI's Altima I product practices the '416 patent.

The '243 patent and the '103 patent relate to module stacking and packaging for electronic devices. *Id.* at ¶¶ 47, 62. BiTMICRO asserts that the Altima I practices the '243 and '103 patents.

### D. The Alleged Domestic Industry

BiTMICRO relies on BNI's activities related to the Altima I and ACE II products to satisfy the economic prong of domestic industry.[4] BiTMICRO relies on the Altima I for a domestic industry with respect to the '243, '416, and '103 patents, and on the ACE II with respect to the '190 patent.

---

[4] A patent owner is permitted to rely on the activities of its licensee to satisfy the economic prong. *Certain Variable Speed Wind Turbines & Components Thereof,* Inc. No. 337-TA-376 Remand, Comm'n Op. at 12 (Oct. 28, 1997). In response to Respondents' argument that pre-license expenditures by BNI should not count toward BiTMICRO's domestic industry, the parties were asked to address this issue in their post-hearing briefs. *See* Complainant's Post-Hearing Brief at 6-8; Respondents' Post-Hearing Brief at 9-10. Several ALJ opinions but no decisions by the Commission were cited by the parties. The Commission has held previously that "the statute requires only that 'an industry in the United States shall be considered *to exist*[,]' but does not specify that such industry must be comprised of one particular entity, *i.e.*, the complainant." *Certain Optical Disc Drives, Components Thereof, and Products Containing the Same* ("*Optical Disc Drives*")*,* Inv. No. 337-TA-897, Corrected Order Remanding the Investigation at 4 (Sept. 29, 2014) (citing 10 U.S.C. § 1337(a)(3)) (alteration in original). *Optical Disc Drives* stands for the proposition that a complainant need not have an interest in the activities giving rise to domestic industry expenditures. It is enough that the complainant owns the patent and licenses it to an entity that has a domestic industry. In this case, the alleged domestic industry existed before BiTMICRO obtained the patents. BiTMICRO can use that domestic industry to satisfy the economic prong, even though BiTMICRO did not own the patent at the time the alleged domestic industry activities took place.

PUBLIC VERSION

### 1.  Altima I

BiTMICRO relies on two types of activities taking place at BNI to satisfy the economic

prong with respect to the Altima I product, operations (manufacturing) and engineering.  *See*

CX-0864C (Uriarte WS) at Q/A 93 (manufacturing, production, and scheduling), 131 (customer

integration and sustaining engineering activities, including integrating products with systems

"used by third-parties supported by BNI's prospective customers.").  BNI's domestic

manufacturing operations occur only at its Fremont, California, facility, but BNI also engages

third-party contractors to perform additional manufacturing activities at other locations in the

U.S.  *Id.* at Q/A 97-105.

The domestic manufacturing activities alleged by Mr. Uriarte begin after BNI receives

and inspects the "component kits" for the Altima I, which are made in [ ████████ ]

[ ████ ].  *Id.* at Q/A 97.  Mr. Uriarte describes in detail the additional steps

needed to "ruggedize" the completed Altima I product, steps that are performed in this country

by BNI or its third-party contractors.  *Id.* at Q/A 98, 101, 106-109, 113, 118, 119.

Mr. Uriarte also identifies alleged engineering activities that take place in areas other than

the manufacturing space at the Fremont facility.  *Id.* at Q/A 154; RX-0088C (map of BNI

facility).  According to Mr. Uriarte, BNI's engineering personnel provide support in office space

and conference rooms throughout the Fremont facility for current and prospective customers, in

addition to conducting product development and quality control testing.  CX-0864C at Q/A 77,

154.  Mr. Uriarte says a variety of BNI employees, including at times administrative and sales

personnel, participate in customer service engineering activities.  *E.g.*, *id.* at Q/A 131-134

(describing customer integration project [ ████ ] that included work by [ ████████ ]

**PUBLIC VERSION**

Mariedel Nolasco); Tr. at 70:11-12).  *See generally,* CX-0826C (allocating time spent by

managerial and sales personnel to domestic industry activities).

The alleged engineering activities also include warranty and repair work, Mr. Uriarte

testifies, as well as testing of replacement parts.  CX-0864C at Q/A 140, 147.  In addition,

BiTMICRO claims expenditures related to BNI's preparation of responses to statement of work

("SOW") requests.  *Id.* at Q/A 148.  SOW responses also involve contributions from employees

with a variety of job duties, including administrative and executive functions.  *Id.*

### a.  Plant and Equipment



BNI shares the [                    ] Fremont facility with a related company, NVXL.  CX-

0864C at Q/A 18-20.  NVXL, which makes an unrelated product, [                    ]

[                    ].  Tr. (Uriarte) at

100:3-17.  The portion of the square footage dedicated to Altima I manufacturing, according to

Mr. Uriarte, is [          ].  CX-0864C at Q/A 20.  In FY 2017, BNI's total alleged

investments related to this space include rent, utilities, repair and maintenance, insurance, taxes,

and equipment.  CX-0863C (Rosolowski WS) at Q/A 47.  *See* CDX-863.1C.[5]  For the purposes

of this litigation, BNI allocated [    ] of the total investment for plant and equipment to the

Altima I product, reflecting the [          ] manufacturing space within the total [    ]

---

[5] BiTMICRO has presented investments going back to FY 2013.  Consistent with the Federal
Circuit's holding in *Motiva, LLC v. Int'l Trade Comm'n,* 716 F.3d 596, 601 n. 6 (Fed. Cir. 2013),
the important investments are those that relate to the time period when the complaint was filed,
not the preceding five years.  *See Certain Television Sets, Television Receivers, Television
Tuners, and Components Thereof,* Inv. No. 337-TA-910, Comm'n Op., 2015 WL 6755093 at *32
(Oct. 30, 2015).  [                    ]  In this opinion, I have used as the
measure of domestic industry expenditures the most recent complete fiscal year proximate to the
filing of the complaint on December 21, 2017.  BiTMICRO has not identified any major change
in its operations from previous years, and considering more years would not change the overall
domestic industry analysis.

**PUBLIC VERSION**

█ █ overall floor space. *Id.* at Q/A 52. For FY 2017, the total allocated expenditure was █ █ ]. *Id.* at Q/A 58.

In addition to the [ ] of dedicated space for Altima I production BiTMICRO, as noted above, maintains that engineering, development and customer support activities related to the Altima I were performed in various office spaces at BNI's Fremont facility. BiTMICRO has attempted to quantify the amount of such office space based on Mr. Uriarte's "general recollection" of where the employees who performed such activities worked. Based on Mr. Uriarte's recollection, BiTMICRO allocates square footage to domestic industry activities. The square footage for engineering activities [ ██ ] that for manufacturing. For BNI's fiscal year 2017, Mr. Uriarte allocated [ ] to these activities. CX-0864C at Q/A 154.

Recognizing, however, that not all the work performed in these spaces was devoted to Altima I engineering activities, BiTMICRO further allocates this space based on the amount of time spent in that space by the employees who allegedly worked on Altima I engineering activities. CX-0864C (Uriarte WS) at Q/A 157; CX-0863C (Rosolowski WS) at Q/A 67-69. The amount of non-dedicated office space allegedly used for Altima I engineering activities is proportional to the amount of time Mr. Uriarte estimates that BNI employees were engaged in those activities. CX-0863C (Rosolowski WS) at Q/A 69.[6] Using this allocation methodology,

---

[6] Staff describes this as the "headcount methodology." *See* Staff Post-Hearing Br. at 20 (citing *Certain Access Control Systems and Components Thereof,* Inv. No. 337-TA-1016, Order No. 26 2017 WL 2061231, at *7 (Apr. 28, 2017); *Certain Motorized Self-Balancing Vehicles,* Inv. No. 337-TA-1000, Initial Determination at 65-66 (May 26, 2017)).

BNI's plant and equipment expenditures related to BNI's office space activities are calculated as

[          ] for BNI's FY 2017.  *Id.* at Q/A 73-74.[7]

The total plant and equipment expenditure that BiTMICRO allocates to the Altima I in

FY 2017 is [    ].  Complainant's Post-Hearing Brief at 38; CX-0863C (Rosolowski WS) at

Q/A 76; CX-0865C (Bazelon WS) at Q/A 46.

### b.  Labor or Capital

Mr. Uriarte also supplies an allocation for labor expenditures related to the Altima I

product, again relying on his memory of BNI's activities.  CX-0864C (Uriarte WS) at Q/A 79.

He testifies that his allocations are based on his intimate knowledge of the work being done at

BNI and his experience as BNI's president and general counsel, as well as his review of emails,

calendar entries, and customer proposals and invoices.  Tr. at 79:4-25 (Uriarte); CX-0864C

(Uriarte WS) at Q/A 82.  He testifies further that he interviewed current BNI employees in an

effort to verify his estimates.  *Id.*

Based in part on Mr. Uriarte's allocations of BNI employees' time to the Altima I

product, BiTMICRO claims expenditures for "technical labor."  CX-0863C (Rosolowski WS) at

Q/A 105.  The amounts of these expenditures are only partially attributable to Mr. Uriarte

because Larry Rosolowski, the accountant hired to testify as BNI's chief financial officer for

purposes of this litigation, makes his own contribution to these totals.[8]  Mr. Rosolowski uses a

---

[7] Staff asserts that Mr. Uriarte's estimates of employee time on Altima I in the Fremont office space are "conflicting" and "unreliable."  *See* Staff Post-Hearing Br. at 24-25.  In other respects, Staff says Mr. Uriarte's allocations are proper.  *Id.* at 39 n. 13 ("[U]nlike the plant expenditure allocation for office space, the labor allocation does not involve considering where in the plant the employee work occurred.")

[8] Although Mr. Rosolowski's testimony is presented as that of BNI's "acting Chief Financial Officer," he actually is an "accounting consultant."  CX-0863C (Rosolowski WS) at Q/A 23. Mr. Rosolowski has no knowledge of BNI outside of what he has learned to prepare for this litigation.  *See* RX-0005C (Rosolowski Dep.) at 20:17-22:17; 23:18-24; 24:10-18; 24:24-25:24;

**PUBLIC VERSION**

multi-step process to compute the labor expenditures related to Altima I.  First, he takes all the employees in the engineering, legal and business development, and operations departments.  He then generates labor expense reports for those entire departments and totals them up.  CX-0863C (Rosolowski WS) at Q/A 94-102.  Mr. Rosolowski then adds to those numbers amounts for employee Zophar Sante, who "does not fit within any of the three departments."  *Id.* at Q/A 103. Zophar Sante's job title is "Sales-Strategic Accounts."  CX-0826C.[9]

Mr. Rosolowski then uses Mr. Uriarte's employee time estimates and the "technical employees' yearly salaries shown in CX-642C to create a payroll weighted average for each fiscal year."  CX-0863C at Q/A 107.  "The payroll weighted average is calculated by multiplying each employee's percentage of time spent on a particular product by the employee's respective salary for each fiscal year."  *Id.* at Q/A 108.  For the fiscal year 2017, Mr. Rosolowski calculates a payroll weighted average [ ▮ ].  *Id.* at Q/A 111.  He then applies the payroll weighted average to BNI's direct labor expenses for "technical employees" to arrive at the total for BNI's Altima I expenses in FY 2017 [ ▮ ].  *Id.* at Q/A 112, 113.

Mr. Rosolowski adds two additional components to his calculation of labor and capital expenditures.  *See* CX-0863C at Q/A 84 (testifying that he included three different types of expenditures in his analysis:  BNI's U.S. employees, BNI's as-needed contract employees in the U.S., and "BNI's payments to U.S. third-party contract manufacturers.").  For FY 2017, contract labor expenditures related to the Altima I amount to [ ▮ ].  *Id.* at Q/A 117.  Mr. Rosolowski

---

37:11-38:16.  [ ▮ ], having been engaged by counsel for BiTMICRO.  Tr. 142:4-18; RX-0005C (Rosolowski Dep.) at 20:17-11. He has been paid [ ▮ ] for activities related to this litigation.  Tr. 152:15-153:4 (Rosolowski); RX-0005C (Rosolowski Dep.) at 24:15-18.

[9] Dr. Bazelon excluded expenditures related to Mr. Sante and those of [ ▮ ] Mariedel Nolasco in his analysis.  CX-0865C at Q/A 79.

PUBLIC VERSION

adds payments to third-party manufacturers for activities related to the Altima I product in the

amount of [         ]. *Id.* at Q/A 122. Mr. Rosolowski counts all payments made to third parties,

regardless of the nature of such payments.[10]

    The total labor and capital expenditure that BiTMICRO allocates to the Altima I in FY

2017 is [      ]. Complainant's Post-Hearing Brief at 41-43 (adding Table 11, Table 12, and

Table 13); CX-0863C (Rosolowski WS) at Q/A 113, 118, 123; *see* CX-0865.6C (Bazelon table

providing yearly totals).

    The total domestic industry expenditure related to the Altima I product in BNI fiscal year

2017, adding together the subtotals from subsections (A) and (B), is [      ].

### c.  Research and Development, Engineering

    As an alternative to the allegations that BiTMICRO satisfies the domestic industry

requirement under subsection (A) and (B), BiTMICRO presents engineering, research and

development expenditures under subsection (C). The amounts presented match alleged BNI

expenditures for plant and equipment and labor relating to "technical employees not in the

operations department." Complainant's Post-Hearing Brief at 53.

    BiTMICRO asserts that all its activities have a nexus to the asserted patents, in the sense

that the Altima I includes multistacking related to the '243 and '103 patents. *See id.* at 54-55.

BiTMICRO describes "the research and development necessary to create the multistack versions

---

[10] Staff cites *Certain Kinesiotherapy Devices and Components Thereof,* Inv. No. 337-TA-823, Comm'n Op. at 30 (July 12, 2013) for the proposition that amounts paid to third parties may include items such as facility costs and profit. Staff Post-Hearing Br. at 33. Respondents say the Federal Circuit's decision in *Lelo, Inc. v. Int'l Trade Comm'n,* 786 F.3d, 879, 880 (Fed. Cir. 2015) overruled *Kinesiotherapy* on this point. Staff responds that *Lelo* is distinguishable because the third parties in that case were mere retailers and the components purchased by the complainant were "off the shelf," Staff Post-Hearing Br. at 33 (*citing Lelo*), 786 F.3d at 884, whereas the contractors here were hired to provide specialized services to BNI. Therefore, Staff argues, the entire payment made to them by BNI should be included as domestic industry investment. I agree with Staff on this point.

PUBLIC VERSION

of Altima I," including designing and developing hardware, firmware, and software for the products. *Id.* at 55.  BNI operations employees "also performed production planning, scheduling, and manufacturing for the Altima I, as they have evolved from prototypes to commercially viable products." *Id.* (citing CX-0864C (Uriarte WS) at Q/A 183-185). BiTMICRO also describes "sustaining engineering," such as replacing Altima I's controller board.

Regarding the '416 patent, BiTMICRO says the Altima I uses the patented technology to increase the speed of flash memory erase and write operations.  CIB at 55 ("The Altima I includes functionality that increase the speed of flash memory erase and write using those operations.").  BiTMICRO says that BNI engineers perform "sustaining engineering to ensure that the ▮▮▮▮ functionality on the Altima I works properly." *Id.* at 56.

### 2.  ACE II

BiTMICRO alleges that ▮▮▮▮▮▮▮ BNI began product development and engineering for a new product, the ACE II, in the office and conference room space at BNI's Fremont facility.  The ACE II product is manufactured entirely overseas. CX-0864C (Uriarte WS) at Q/A 5.  BiTMICRO contends that a domestic industry related to ACE II exists based on domestic "▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" related to the ACE II product.  Complainant's Post-Hearing Brief at 5.

BiTMICRO again relies on Mr. Uriarte's estimates to determine the amount of domestic industry expenditures related to the ACE II.  CX-0863C (Rosolowski WS) at Q/A 78.  As with the Altima I, to estimate plant and equipment expenditures, Mr. Rosolowski utilizes Mr. Uriarte's estimated percentage of employee time spent at Fremont on ACE II activities and

applies that percentage to BNI's overall expenditures "for the office space." *Id.* at Q/A 80-81. This yields the amount of [     ] for FY 2017. *Id.* at Q/A 81.

Mr. Rosolowski also employs the same methodology he used to estimate expenditures on the Altima I to derive his estimates of labor and capital expended in connection with the ACE II. Using Mr. Uriarte's time estimates and BNI employee salaries, Mr. Rosolowski derives the amount of [     ] for labor in BNI fiscal year 2017. *Id.* at Q/A 125, 127-128.

The total alleged domestic industry expenditure related to the ACE II under subsections (A) and (B) in BNI FY 2017 thus is [     ].

Under subsection (C), BiTMICRO claims that its activities on the ACE II product "have the required nexus to the '190 patent." Complainant's Post-Hearing Brief at 59. It says the ACE II has a memory controller that includes the functionality covered by the '190 patent. *Id.* BiTMICRO relies on activities of BNI's engineering and operation departments in Fremont, which "[     ]" to create the ACE II and allow its memory controller to function as described in the '190 patent. *Id.*

## II.   DISCUSSION

### A.   Pertinent Background of the Economic Prong

The economic prong requirements are set forth in subsections (2) and (3), of section 337(a).  Subsection (3), the provision at issue in this case, provides:

> For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned –
> > (A) significant investment in plant and equipment;
> > (B) significant employment of labor or capital; or
> > (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3).

**PUBLIC VERSION**

Before Congress enacted section 337(a)(3) in 1974, the Commission required under section 337 that "'the patent must be *exploited by production* in the United States.'" *Schaper Mfg. Co. v. Int'l Trade Comm'n,* 717 F.2d 1368, 1372 (Fed. Cir. 1983) (quoting H. Rep. No. 93-571, 93 Cong. 1st Sess. 78 (1973) (emphasis added). *Accord, InterDigital Commc'ns, LLC v. Int'l Trade Comm'n,* 707 F.3d 1295, 1300 (Fed. Cir. 2013) (construing pre-1988 statute "to require proof of the existence (or prospect) of a domestic industry that was manufacturing the articles protected by intellectual property before the Commission could bar the import of infringing products.") (citation omitted)).  As the Commission held in *Certain Ultra-Microtome Freezing Attachments* "[t]he [then-] wording of the statute itself adds to the conclusion that the statute protects only parties producing under the patent."  Inv. No. 337-TA-10, Comm'n Op. at 8, USITC Pub. No. 771, 195 U.S.P.Q. 653, 656 (April 1976).

When Congress enacted section 337(a)(3), it intended to codify "past Commission practices." *Schaper,* 717 F.2d at 163 n. 8.  The past Commission practices referred to required that "the patent must be exploited by production in the United States, and the industry in the United States generally consists of the domestic operations of the patent owner, his assignees and licensees devoted to such exploitation of the patent." *Id.* at 161 (citing H. Rep. No. 93-571, 93rd Cong. 1st Sess. 78 (1973)).  In decisions from 1930 through 1975, the Commission "defined 'industry' in section 337 investigations as the domestic manufacture or production of the patented product by the patentee or his licensee." *Id.*

This was the state of the law in 1988, when Congress expanded the protection of section 337 to intellectual property owners who did not exploit their property by manufacturing, but instead exploited it by other means.  Congress added a new subsection to cover the activities enumerated in what became subsection (C). *InterDigital,* 707 F.3d at 1300 ("Accordingly,

PUBLIC VERSION

proposals were introduced in Congress to expand the coverage of section 337 so that it would

provide protection for American industries that did not manufacture products but were engaged

in engineering, research and development, or licensing of the technology that others used to

make products.").[11] In *Certain Optoelectronic Devices for Fiber Optic Commc'ns,* Inv. No. 337-

TA-860, Comm'n Op. at 13-14, 20  (May 9, 2014), the Commission recognized the distinction

between subsections (A) and (B) of section 337(a)(3), which pertain to "the production of

articles protected by a patent," and subsection (C), which pertains to "non-production related

expenditures." [12]

    This background indicates several points that are important to my decision regarding the

issues raised here.  First, when it added subsection (C), Congress understood that subsections (A)

and (B) covered only manufacturing.  Second, Congress understood subsections (A) and (B) to

require "exploitation" of the patent.  The difference between those sections and subsection (C) is

that (A) and (B) require exploitation through manufacturing, while (C) requires exploitation

through engineering, R&D, or licensing.[13]  BiTMICRO claims that it can assert its domestic

---

[11] It may be argued that, in the current economic environment, where so much manufacturing activity takes place overseas, the Commission should change the metrics that determine which activities count toward satisfaction of the economic prong.  An ALJ is in no position to make legal findings based on policy rather than law.  *See Schaper,* 717 F.2d at 163 ("If, as appellants suggest, present-day 'economic realities' call for a broader definition to protect American interests (apparently including many of today's importers) it is for Congress, not the courts or the Commission, to legislate that policy.").

[12] The Commission long has recognized that repairing a product made in the U.S., or helping a customer to use that product, is sufficiently related to manufacturing to count under subsections (A) and (B).  *See. e.g., Schaper*, 717 F.2d at 162 (approving inclusion as domestic industry expenditures of "substantial domestic repair and installation activities necessarily associated with" the imported product, especially when accompanied by "some domestic production").

[13] Applying the exploitation requirement as appropriate, based on the type of activity from which the domestic expenditures arise, should eliminate the kind of statutory shell game now played by complainants, like BiTMICRO, who allege engineering and R&D investments under subsections (A) and (B) in order to circumvent subsection (C)'s requirement to demonstrate that domestic

**PUBLIC VERSION**

industry expenditures under any of the three subsections of section 337(a)(3).  Complainant's

Post-Hearing Brief at 8-12.  Subsections 337(a)(3)(A) and (B), if read in this way—literally and

out of the context of the legislative history—would allow a complainant to establish a domestic

industry simply by spending money, regardless of the kind of activity in which the investment is

made or the nexus between that activity and the asserted patent.  That would conflict with

Congress's expressed intent when it enacted subsections (A) and (B), as discussed above.[14]

Activities under subsection (C) cannot automatically be deemed to sufficient under (A)

and (B), because, if they were, Congress never would have needed to enact subsection (C).  If all

that was required was the spending of money, non-manufacturing activities such as those

enumerated in subsection (C) would already have been covered before the 1988 amendments.

With the 1988 amendment, Congress added the protection for engineering, R&D, and licensing

that was afforded already to manufacturing enterprises.  Based on the 1988 amendments,

complainants who invest significant amounts on plant, facilities, labor and capital in the

exploitation of a patent through engineering, R&D, and licensing, are protected in the same way

---

activities must be closely related to the patented technology.  Complainants should not be
permitted to circumvent the Commission's requirements in this manner.

[14] Because the subsections of section 337(a)(3) are written in the disjunctive, the Commission
has held that satisfaction of any one of them suffices to meet the domestic industry requirement.
*E.g., Certain Integrated Circuit Chipsets and Prods. Containing Same,* Inv. No. 337-TA-428,
Order No. 10 at 3, Initial Determination (unreviewed) (May 4, 2000) (citing *Certain Variable
Speed Wind Turbines and Components Thereof,* Inv. No. 337-TA-376, Comm'n Op. at 15,
USITC Pub. 3003 (Nov. 1996).  This does not mean, however, that a complainant can assign
expenditures randomly to any of the three subsections.  On the contrary, "it is incumbent upon
the complainant to specifically prove that the separate requirements and standards of each prong
have been met based on the specific evidence relied upon for that statutory provision."
*Optoelectronic Devices,* Comm'n Op. at 12-13.

as those who invest in manufacturing, but they too must establish an appropriate nexus, *i.e.*, demonstrate that their investments exploit the patent.[15]

## B. Inclusion of Non-Qualifying Investments in DI Expenditures

To calculate labor expenditures, BiTMICRO lumps together BNI's manufacturing as well as non-manufacturing activities as long as they are "technical" in nature. *See* CX-864C (Uriarte WS) at Q/A 154; CX-0863C (Rosolowski WS) at Q/A 85-105. This results in exaggeration of the actual amount of domestic industry investments for two reasons: (1) some sales and marketing activities, administrative activities, and other potentially non-qualifying activities are included in the domestic industry calculations; and (2) engineering activities, other than in connection with the manufacturing process (in which case it would be correct to include them in subsection (A) and (B) expenditures), should be counted under subsection (C), and an appropriate relationship to the patents should be established with respect to those activities.

Under section 337, sales and marketing expenditures traditionally have not been included in investments that count toward satisfaction of the economic prong. It is a cornerstone of domestic industry law under section 337 that sales and marketing activities alone are insufficient to satisfy the economic prong. *See, e.g.*, *Certain Kinesiotherapy Devices and Components Thereof*, Inv. No. 337-TA-823, Comm'n Op. at 29 n. 8 (June 17, 2013), *rev'd on other grounds sub nom.*, *Lelo Inc. v. Int'l Trade Comm'n*, 786 F.3d 879 (Fed. Cir. 2015) ("These expenses primarily relate to sales and marketing and are not the sort of expenditures that the Commission has considered sufficiently related to the claims of the patent. The Commission and the Federal

---

[15] The recitation of "engineering" in subsection (C) raises factual questions about the nature of the engineering activities that are claimed to constitute domestic industry investments. There are many types of engineering activities. Engineering that is integral to manufacturing presumably is covered under subsections (A) and (B). Engineering that is not integral to manufacturing, such as research on the patented technology to create new products, presumably is covered under subsection (C).

**PUBLIC VERSION**

Circuit generally have treated these activities as no different from those of an importer.") (citing *Schaper Mfg. Co. v. U.S. Int'l Trade Comm'n*, 717 F.2d 1368, 1373 (Fed. Cir. 1983).) The Commission also makes clear in *Kinesiotherapy* that sales and marketing expenditures are to be excluded under subsection (C), as well as under (A) and (B). *Kinesiotherapy*, Comm'n Op. at 29 n. 8 (discussing unallowability of sales and marketing expenses "under prong C").

BiTMICRO seeks a way around this settled principle by contending that the sales and marketing activities of its employees are "technical" in nature. But employees who promote and sell technically advanced products still are selling and promoting a product, and their activities in doing so have not been recognized under the economic prong. Such costs should not have been included in BNI's alleged domestic industry.

The evidence of Mr. Uriarte's erroneous allocations is plain on the face of CX-0826C, which is BiTMICRO's chart showing Mr. Uriarte's allocations. The chart shows columns allocating employee time to "E-Disk Altima," "Ace II," "Other Products," and "Non-Technical Time." All "technical" time on the Altima I and ACE II apparently has been allocated to DI investments. The category "Non-Technical Time" represents non-domestic industry time. But there is no precedent for making such an allocation. BiTMICRO conveniently has invented the dichotomy between technical and non-technical activities, a dichotomy that does not exist in the law. This simply is a method of exaggerating dramatically the amount of domestic industry activity that actually takes place at BNI's Fremont facility.

Mr. Uriarte's testimony confirms that he allocates domestic industry expenditures based on "who was performing technical activities directed to our products for each fiscal year since 2013." CX-0864C (Uriarte WS) at Q/A 155. Mariedel Nolasco,                                            , has almost half of her time included as "technical." Her "technical" activities,

**PUBLIC VERSION**

however, include "████ ┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄┄ ┆." Tr. at 83:11-16

(Uriarte).  Although Dr. Coleman Bazelon, BNI's economic expert, testifies that he removed the

activities of Ms. Nolasco and BNI's sales manager, Zophar Sante, from the domestic industry

calculations, Tr. (Bazelon) at 170:11-21, CX-0865C, there is no indication that Mr. Rosolowski

did so.  Ms. Nolasco's testimony, moreover, confirms that at least some of Mr. Uriarte's own

activity, a percentage of which is included in all BNI's calculations, is misallocated to the

alleged domestic industry.  *See* RX-0003C (Nolasco Dep.) at 28:20-29:3 ("Q.  What else does

[Mr. Uriarte] do for the company?  A. ┆ ░░░░ ████████████ ┆

┆ ████████████ ┆

████ ████████ ┆.").  Mr. Uriarte himself

testifies that "████████████ ┆."

CX-0864C (Uriarte WS) at Q/A 78.[16]

Similarly, Mr. Uriarte testifies that the activities related to the Altima I that take place in

California include "Operations," which "is primarily responsible for production planning and

scheduling, and manufacturing," and "Legal & Business Development and Sales," which

"provide assistance to BNI's engineering and operations employees." *Id.* at Q/A 77.  Dr.

Bazelon therefore includes "the General and Administration cost center" in his calculations of

domestic industry labor expenditures.  CX-0865C at Q/A 72-74.[17]  General and administrative

---

[16] Mr. Uriarte allocates ███ of his time for FY 2017 to "E-Disk Altima," ┆ ┆ to "Ace II," ┆ ▁▁
to "Other Products," and ███ to "Non-Technical Time." CX-0826C.0004.  Mr. Uriarte's
percentages do not reveal whether the particular "product development and marketing" activities
described above were allocated to the domestic industry, much less whether they were allocated
under subsection (A), (B) or (C).

[17] Dr. Bazelon states:  "According to Mr. Uriarte's testimony, employees who had worked on
BNI products were in the following departments: Research and Development, Operations, Legal
& Business Development, and Sales.  Under the SAP data, the Legal & Business Development

PUBLIC VERSION

expenditures, however, traditionally have not been counted as investment under subsections (A)

and (B), because administrative activities are not manufacturing.  As the Commission stated in

1987:

> We therefore have excluded the value added by upstream and downstream
> production activities, as well as royalties and overhead, and general and
> administrative expenses from our analysis.  No arguments have been made which
> would lead to a conclusion that these latter activities are any more production-
> related in the DRAM industry than in any other industry.  Therefore, there is no
> reason to depart from precedent with respect to exclusion of royalties, overhead,
> and general and administrative expenses from the analysis.

*Certain Dynamic Random Access Memories, Components Thereof and Products Containing*

*Same*, Inv. No. 337-TA-242, Comm'n Op., 1987 WL 450856 at \*31 (Sept. 21, 1987), *affirmed in*

*part, reversed in part, and vacated in part on other grounds by Texas Instruments Inc. v. U.S.*

*Int'l Trade Comm'n*, 871 F.2d 1054 (Fed. Cir. 1989).

### C.  Mr. Uriarte's Credibility Issues

Mr. Uriarte purports to have been able to reconstruct the activities of about a dozen

employees (not necessarily the same ones) over a five-year period.  He allocates space to

domestic industry activities based on where the employees sat in rooms that were scattered

through the Fremont facility.  RX-0089C (site map).  Mr. Uriarte is not omniscient; he could not

always see what the employees were doing when they were doing it.  He may have had an idea

what they were supposed to be doing at any given time, but it is not believable that he could

determine with reliability what product-specific tasks his employees were performing over a

five-year period without some record to assist him.  Making reliable allocations based on who sat

in a particular conference room or an office would be particularly difficult given that, as Mr.

Uriarte testifies, "

department falls under the General and Administration cost center and the Sales Department falls
under the Sales and Marketing cost center." CX-0865C at Q/A 74.

[                                                    ].”  CX-0864C (Uriarte WS) at Q/A 156.
The astonishing feat of memory that Mr. Uriarte allegedly achieved is implausible and renders
his estimates of space devoted to Altima I manufacturing unreliable.

There is further reason to doubt Mr. Uriarte's credibility.  To bolster his "general
recollection," Mr. Uriarte testifies that he made his own initial estimates of time for each
employee, then reviewed "emails, calendar entries, and customer proposals and invoices" to
derive the estimates provided with BiTMICRO's complaint.  CX-0864C (Uriarte WS) at Q/A 82;
*see also* Tr. at 79:13-80:15 (Uriarte).  No notes, calendars, work papers or documents were
produced during discovery to corroborate his alleged efforts, however, nor are such documents
exhibited in the record.  Tr. at 79:4-17, 108:25-109:8 (Uriarte).  Mr. Uriarte also maintains that
he asked his department heads to provide time estimates for the operations and engineering
departments, but no documentation of those employees' estimates was produced in discovery or
at the hearing.  *See* CX-0864C (Uriarte WS) at Q/A 82.

The failure to produce these documents undermines Mr. Uriarte's credibility.  If a witness
says there is documentary evidence to support his testimony but he refuses to produce that
evidence, I can only conclude that there is no such evidence or if there is, it does not corroborate
the witness's testimony.  At best, Mr. Uriarte's allocations are speculative, based on documents
like invoices, which he used as "points of reference."  *See* Tr. at 109:5-8 (Uriarte).

Mr. Uriarte's testimony becomes more implausible when he contends that employees
who contradict his allocations did not know what they were working on.  Absent some
explanation for why employees in a very small shop like BNI's would not know what they were
working on, I cannot credit Mr. Uriarte's testimony.  Instead, I find that his testimony concerning
the allocation of employee time in some cases is contradicted by the employees themselves, and

PUBLIC VERSION

that his aspersions on the mental acuity of an employee who disagrees with him are incompatible with reliable, objective testimony. *See* Tr. at 88:18-89:10, 89:14-23 (Uriarte).[18]

Labor expenditures constitute, ▮▮▮▮▮▮▮▮▮▮, the biggest part of BiTMICRO's alleged domestic industry. Any errors Mr. Uriarte may have made in allocating labor expenditures are magnified by the fact that those allocations were used by Mr. Rosolowski and Dr. Bazelon to make their allocations of BNI's engineering space and labor expenditures. Tr. at 74:7-12 (Uriarte). *See supra.*

For the reasons stated above, I find that BiTMICRO's witnesses do not provide credible testimony to establish any reliable accounting for BNI's domestic industry expenditures.

### D. Sufficient Evidence to Satisfy the Economic Prong for the Altima I

Notwithstanding that much of Mr. Uriarte's testimony is incredible and that BiTMICRO has improperly included certain administrative, sales and marketing costs as part of the alleged domestic industry expenditures, there is sufficient evidence to find that the economic prong has been satisfied with respect to the Altima I.

According to Mr. Uriarte, BiTMICRO produced the Altima I by importing components ▮▮▮▮▮▮▮▮ and performing various assembly, testing, and "ruggedizing" steps to manufacture a final product at its Fremont facility. CX-0864C at Q/A 94-98. BNI in the U.S.

---

[18] There are additional reasons to mistrust Mr. Uriarte's unsupported testimony. As a BNI executive, he has a strong financial interest in this litigation. Even witnesses who are in good faith doing their best to be fair and reasonable may exaggerate in such circumstances. *See, e.g.*, Tr. at 76:5-12 ("You know, this was six years ago, and I work very hard in good faith to come up with good-faith estimates within a time period of the company where there was quite a bit of turmoil and quite a bit of effort put into different projects with the company. And so we had different people changing in different responsibilities . . . . And also, let me please add that there are no sales and marketing time in here in any way."). *See also id.* at 102:3-4 ("I would say I put in a good-faith estimate as to where people sat."); 104:1-4 ("[Y]ou know, this was not a perfect exercise, and you can say I'm altering my testimony. I'm just trying to get you a good-faith response . . . .").

**PUBLIC VERSION**

performed "hours of unusually rigorous environmental testing to ensure maximum performance"
of the Altima I, Mr. Uriarte says. *Id.* at Q/A 31. He says certain "specialized portions of the
Altima I production process are handled by third-party contract employees and contract
manufacturers, in the United States, under contract to BNI." *Id.* at Q/A 90. *See id.* at Q/A 98-
105, 109-117, 121-123. Exhibits CX-0020C, 0350C, and 0354C-0362C are contracts between
BNI and various "independent contractors" for services like those described by Mr. Uriarte.

    Mr. Rosolowski allocates to domestic Altima I production some contract manufacturing
costs based on work done by third parties in California and Alabama. CX-0863C at Q/A 119-
123. There is documentary evidence that these domestic manufacturers contribute to the
"ruggedization" of the imported Altima I product. *See* CX-0864C (Uriarte WS) at Q/A 92-106.
In addition, Mr. Rosolowski identifies expenditures on ⎸   ⎸ contract employees who worked on
Altima I assembly. CX-0863C at Q/A 114-118. The service agreements for these contractors
are in the record, and Mr. Uriarte describes the activities they performed. CX-0864C at Q/A
121-125. Mr. Rosolowski and Dr. Bazelon agree that for FY 2017, there were ⎸   ⎸ in
Contract Employee Expense, and ⎸   ⎸ in Contract Manufacturing Costs. CX-0863C
(Rosolowski WS) at Q/A 118, 123; CX-0865C (Bazelon WS) at Q/A 72. Based on the
documentary evidence, these expenditures, although minimal, support the conclusion that BNI's
activities with respect to the Altima I are more than those of a mere importer.

    In addition, the record supports BiTMICRO's claim that some amount of production
related work was performed on Altima I units after the importation of components ⎸█████⎸
⎸    ⎸. CX-0864C (Uriarte WS) at Q/A 32-49. Mr. Uriarte says BNI has made more than
⎸  ⎸ Altima I products in the U.S. since 2014, with a total sales value of more than ⎸    ⎸.
*Id.* at Q/A 37-49. A total of ⎸██⎸ Altima I products allegedly were made in Fremont in FY 2017,

**PUBLIC VERSION**

yielding revenue of [          ]. *Id.* at Q/A 44-46.  How much of the work that went into making

these products was performed in the U.S. cannot be determined reliably on this record, but the

products apparently existed and were sold.  *See* CX-0022C (purchase orders).  Mr. Uriarte

identifies [          ] lab space in BNI's Fremont facility that is used solely to perform

manufacturing, assembly, quality control, packaging, and shipping for Altima I products.  CX-

0864C at Q/A 20.  There are photographs in the record of space in the BNI facility in Fremont

where production work of the kind described by Mr. Uriarte apparently was done.  *Id.* at Q/A 92

(citing CX-0693C through CX-0784C).  Mr. Rosolowski allocates a portion of BNI's rent,

property tax, insurance, utilities, maintenance, and equipment expenditures to this space, totaling

[          ] for FY 2017.  CX-0863C at Q/A 56-58; *see also* CX-0865C (Bazelon WS) at Q/A 66

(performing similar allocation and finding "over [          ] in FY 2017 alone" invested in the

Altima I manufacturing line).

   BiTMICRO says BNI's domestic investments in plant and equipment for its Altima I

products since fiscal year 2015, "by a very conservative measure, have varied between 22% and

24% of BNI's total unallocated U.S. plant and equipment expenses."  CIB 48; CX-0865C

(Bazelon WS) at Q/A 101.  BiTMICRO also says BNI's domestic industry expenses in labor and

capital for Altima I have varied between 13% and 29% of its total labor and capital expenses,

"averaging just over 21% per year since fiscal year 2015."  *Id.* at Q/A 102.  BiTMICRO also

says that revenue from Altima I sales accounts for over [     ] of BNI's total revenue.  CIB at 60.

I have no reason to question that the Altima I product was significant to BNI's domestic

operations, even if these numbers are greatly exaggerated.  Documentation supporting BNI's

production related activities on the Altima I are found in the record.  *See* CX-0142C, CX-0143C,

CX-0145C through CX-0147C (device history records); CX-0636C, CX-0637C (invoices).

**PUBLIC VERSION**

Since there is no reliable data on labor expenditures and allocations, however, an exact amount of value added cannot be reliably determined.  Staff attempts to perform a "proper" value-added analysis, resulting in a value-added figure of about 36%.  Staff Post-Hearing Brief at 39-43.[19]  To arrive at this number, Staff looks at the two years before the complaint was filed, 2015-2017, to calculate the sum of:  "(1) domestic plant and equipment expenses solely attributed to the dedicated manufacturing area; and (2) domestic labor expenses ((a) expenses incurred from employment of direct employee labor, (b) expenses incurred from employment of contract employee labor, and (c) expenses incurred from payments for contractor work)."  *Id.* at 40-41.  For FY 2015 through December 2017, Staff says the total domestic plant and equipment expenses attributed to the dedicated space is [        ]; and the total domestic labor expense is [        ], resulting in a total domestic industry expenditure of [        ].  *Id.* at 40.

Staff divides this sum by the number of drives produced domestically for the time period, resulting in a per-product domestic expenditure of [        ].  Next, Staff divides this per-product domestic cost by the sum of this expenditure and the per product aggregate expenditure of the imported components, thereby yielding a domestic value-added percentage of approximately 36%.  *Id.*  I could adopt Staff's estimate of 36% value added if the numbers that went into the calculation were reliable, but they are not.

Staff asserts that whether 36% of domestic value added is sufficient to satisfy the economic prong is a "close call."  *Id.* at 41.  Staff cites the proposition that there is no "rigid formula" for deciding the economic prong and "percentage value added" will depend on the circumstances of each investigation."  *Id.* (citing *Certain Male Prophylactic Devices*

---

[19] Staff apparently performs the value added calculations based on Staff's conclusion that BiTMICRO's labor allocations are proper, even though its plant allocations exaggerate the amount of investment.  Staff Post-Hearing Brief at 39.

**PUBLIC VERSION**

("*Prophylactic Devices*"), Inv. No. 337-TA-546, Comm'n Op. at 39, USITC Pub. 4005 (May

2008); *Certain Soft Sculptured Dolls Popularly Known as "Cabbage Patch Kids," Related*

*Literature and Packaging Therefor*, Inv. No. 337-TA-231, USITC Pub. 1923 at 32 (Nov. 1986)).

I cannot find that a decision on the economic prong is a "close call," however, without knowing

to what the call is close.

The Commission has stated that "there is no mathematical threshold test." *Prophylactic*

*Devices*, Comm'n Op. at 39.  In *Certain Stringed Musical Instruments and Components Thereof*,

the Commission "emphasize[d] that there is no minimum monetary expenditure that a

complainant must demonstrate to qualify as a domestic industry."  Inv. No. 337-TA-586,

Comm'n Op. at 25, 2009 WL 5134139 at *16, USITC Pub. No. 4120 (Dec. 2009).  To

demonstrate the existence of a domestic industry, the Commission required "a sufficiently

focused and concentrated effort."  *Id.* at *17.  Even if the qualifying investments in this case

amount to much less than BiTMICRO asserts, as I am convinced that they do, the nature of the

activities engaged in by BNI demonstrates a sufficiently focused and concentrated effort such

that, whatever the actual amount is, it would be sufficient.  Because the record shows that BNI

performs at least some domestic industry activities related to manufacturing the Altima I, the

precise amount of value added is not necessarily determinative.[20]  The value added could be

much lower than the Staff calculates and I still would be persuaded that BNI is more than a mere

importer. Accordingly, BiTMICRO has established the existence of a domestic industry in the

manufacture of the Altima I under subsections (A) and (B) of section 337(a)(3).[21]

---

[20] While BiTMICRO has not presented a reliable amount of domestic industry expenditures, it
has presented evidence to quantify its investments.  *See Lelo,* 786 F.3d at 883 (quantitative
analysis required).

[21] BiTMICRO asserts that some of BNI's investments under subsection (A) and (B) 'could
qualify as 'engineering' or 'research and development' expenditures" under subsection (C),

PUBLIC VERSION

### E. Insufficient Evidence to Satisfy the Economic Prong for the ACE II

With respect to the ACE II product, BiTMICRO concedes that all manufacturing for this product occurs overseas. *See* CX-0864C (Uriarte WS) at Q/A 86 ("The Ace II product is currently manufactured in the Philippines . . . ."). BiTMICRO nevertheless claims a domestic industry under subsections (A) and (B) based on certain product development and engineering activities. Complainants' Post-Hearing Brief at 56-58. The actual activities are not described with sufficient specificity to determine whether they constitute a significant or substantial domestic industry.

Mr. Uriarte's own engineering activities, as he describes them, focus on development of a new product, the ACE II, rather than manufacturing an existing product. *See* CX-0864C (Uriarte WS) at 78 ("I'm an electric engineer by education and training and



."). The activities of other BNI employees with respect to the ACE II product are similar, and BiTMICRO explicitly disclaims any domestic investments related to "manufacturing, assembly, quality control testing" for the ACE II. Complainant's Post-Hearing Brief at 56-57 n.19.[22] These non-manufacturing activities on the ACE II cannot be counted under subsections (A) and (B).

---

including expenditures for office space and labor "relating to technical employees not in the operations department." Complainant's Post-Hearing Brief at 53. In other words, BiTMICRO maintains that it's so-called technical expenditures count as R&D under subsection (C). *See id.* at Table 17 and Table 18. As for nexus, BiTMICRO does little more than argue that the Altima I uses the patented technology. *Id.* at 54-55. BiTMICRO also presents no evidence to demonstrate substantiality under subsection (C), apart from the flat statement that its non-manufacturing investments are "substantial." CX-0865C (Bazelon WS) at Q/A 111.

[22] Mr. Uriarte admits that [                              ]. CX-0864C at Q/A 88.

**PUBLIC VERSION**

As to subsection (C), BiTMICRO identifies little to no evidence to demonstrate the required nexus between its engineering activities and the patented technology or to quantify BNI's activities on that basis.  BiTMICRO points to one March 2017 meeting agenda that includes the statement, "[                                      ]," CX-0639C.004, and argues that the [            ] includes a memory controller that is related to the functionality claimed in the '190 patent.  Complainant's Post-Hearing Brief at 59.  Mr. Uriarte testifies that the claimed engineering efforts "[                                                    ]." CX-0864C at Q/A 194.  This vague, unsubstantiated testimony is insufficient to carry BiTMICRO's burden to show that its expenditures "are closely related to and enable exploitation of the patented technology." *Certain Marine Sonar Imaging Devices, Including Downscan and Sidescan Devices, Products Containing the Same, and Components Thereof*, Inv. No. 337-TA-921, Comm'n Op. at 65 (Jan. 6, 2016).

BiTMICRO, moreover, makes no attempt to quantify the time or expenditure associated with the alleged domestic industry activities.  Presumably, activities related to the memory controller are only a subset of the total activities that BiTMICRO is claiming with respect to the ACE II.  But BiTMICRO has made no allocation of these expenditures and provided no comparative analysis from which to make a determination on whether the investment is substantial.  BiTMICRO relies solely upon a conclusory statement by Dr. Bazelon that the investment in the ACE II "is quite significant for a company the size of BNI." CX-0865C at Q/A 65.  This does not suffice to demonstrate that BiTMICRO's investment is substantial under section 337(a)(3)(C).

Accordingly, BiTMICRO has failed to satisfy the economic prong of the domestic industry requirement with respect to the ACE II product.

## III.   CONCLUSION

For the foregoing reasons, I find that the economic prong of the domestic industry requirement is satisfied with respect to the Altima I product.  The domestic industry requirement has not been satisfied with respect to the ACE II product.  Accordingly, the '190 patent is hereby terminated from the investigation.

Pursuant to the Notice of Investigation, petitions for review of this initial determination shall be due five calendar days after service, and any replies shall be due three business days after service.  This initial determination shall become the Commission's final determination 30 days after the date of service unless the Commission determines to review.

Discovery is hereby re-opened with respect to the '243 patent, '416 patent, and '103 patent, and to accommodate these proceedings, the administrative law judge will issue an order regarding the procedural schedule.

This initial determination is being issued with a confidential designation, and pursuant to Ground Rule 1.10, each party shall submit to the Administrative Law Judge a statement as to whether or not it seeks to have any portion of this determination deleted from the public version within seven (7) days.  See 19 C.F.R. § 210.5(f).  A party seeking to have a portion of the determination deleted from the public version thereof must attach to its submission a copy of the determination with red brackets indicating the portion(s) asserted to contain confidential business information.[23]  The parties' submissions under this subsection need not be filed with the

---

[23] Redactions should be limited to avoid depriving the public of the basis for understanding the result and reasoning underlying the decision.  Parties who submit excessive redactions may be required to provide an additional written statement, supported by declarations from individuals

PUBLIC VERSION

Commission Secretary but shall be submitted by paper copy to the Administrative Law Judge and by e-mail to the Administrative Law Judge's attorney advisor.

**SO ORDERED.**

Dee Lord
Administrative Law Judge

---

with personal knowledge, justifying each proposed redaction and specifically explaining why the information sought to be redacted meets the definition for confidential business information set forth in Commission Rule 201.6(a).  19 C.F.R. § 201.6(a).

CERTAIN SOLID STATE STORAGE DRIVES, STACKED
ELECTRONICS COMPONENTS, AND PRODUCTS
CONTAINING SAME

Inv. No. 337-TA-1097

## PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **INITIAL DETERMINATION** has
been served by hand upon the Commission Investigative Attorney, **Reginald Lucas, Esq.**, and
the following parties as indicated, on June 7, 2018.

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

**On Behalf of Complainants BiTMICRO, LLC:**

| | |
|---|---|
| Jonathan J. Engler, Esq. | ☐ Via Hand Delivery |
| **ADDUCI, MASTRIANI & SCHAUMBERG, L.L.P.** | ☑ Via Express Delivery |
| 1133 Connecticut Avenue, N.W. | ☐ Via First Class Mail |
| Washington, DC 20036 | ☐ Other:_____ |

**On Behalf of Respondents Samsung Electronics Co., Ltd.,
Samsung Semiconductor, Inc., and Samsung Electronics
America, Inc.:**

| | |
|---|---|
| Paul F. Brinkman | ☐ Via Hand Delivery |
| **KIRKLAND & ELLIS LLP** | ☑ Via Express Delivery |
| 655 Fifteenth Street NW | ☐ Via First Class Mail |
| Washington, DC 20005 | ☐ Other:_____ |

**On Behalf of Respondent Transcosmos America Inc. and
VAIO Corporation:**

| | |
|---|---|
| Eric J. Fues | ☐ Via Hand Delivery |
| **FINNEGAN, HENDERSON, FARABOW, GARRETT &** | ☑ Via Express Delivery |
| **DUNNER, LLP** | ☐ Via First Class Mail |
| 901 New York Avenue, NW | ☐ Other:_____ |
| Washington, DC 20001 | |

**On Behalf of Respondents SK Hynix Inc. and SK Hynix
America Inc.:**

| | |
|---|---|
| Indranil Mukerji | ☐ Via Hand Delivery |
| **FISH & RICHARDSON PC** | ☑ Via Express Delivery |
| The McPherson Building | ☐ Via First Class Mail |
| 901 15th Street NW, 7th Floor | ☐ Other:_____ |
| Washington, DC 20005 | |

CERTAIN SOLID STATE STORAGE DRIVES, STACKED     **Inv. No. 337-TA-1097**
ELECTRONICS COMPONENTS, AND PRODUCTS
CONTAINING SAME

Certificate of Service – Page 2

**On Behalf of Respondents Lenovo Group Ltd. and Lenovo
(United States) Inc. :**

Stephen M. Hankins                     ☐ Via Hand Delivery
**RILEY SAFER HOLMES & CANCILA LLP**    ☒ Via Express Delivery
456 Montgomery Street, 16th Floor        ☐ Via First Class Mail
San Francisco, CA 94105              ☐ Other:_____

**On Behalf of Respondents HP Inc., Hewlett Packard
Enterprise Co., Acer Inc., Acer America Corp.. ASUSTeK
Computer Inc. and ASUS Computer International:**

Andrew R. Kopsidas                  ☐ Via Hand Delivery
**FISH & RICHARDSON P.C.**           ☒ Via Express Delivery
The McPherson Building             ☐ Via First Class Mail
901 15th Street NW, 7th Floor        ☐ Other:_____
Washington, DC 20005

**On Behalf of Respondents Dell Inc. and Dell Technologies
Inc.:**

Adam J. Kessel                       ☐ Via Hand Delivery
**FISH & RICHARDSON P.C.**           ☒ Via Express Delivery
One Marina Park Drive              ☐ Via First Class Mail
Boston, MA 02210                 ☐ Other:_____